### 1351

Andrea L. Taylor GARLAND, Appellant v. CHARLESTON NAVAL SHIPYARD FEDERAL CREDIT UNION, Life Insurance Company of North America and Freimark and Thurston Agency, Inc., Respondents.

(382 S. E. (2d) 250)

Court of Appeals

*William J. Clifford,* Charleston, *for appellant.*

*Joseph H. McGee,* Charleston, *for respondents.*

Heard May 16, 1989.

Decided June 12, 1989.

GOOLSBY, Judge:

Andrea L. Taylor Garland brought this action alleging several causes of action against the Charleston Naval Shipyard Federal Credit Union ("Credit Union"), the Life Insurance Company of North America ("INA"), and the Freimark & Thurston Agency, Inc. ("Freimark & Thurston"). Her action seeks, among other things, to recover the face amount of an accidental death insurance policy allegedly purchased by her husband, Garry J. Taylor, before his accidental death. The trial court, however, sitting without a jury, found in favor of the three defendants. Garland appeals. We affirm.

## FACTS

Taylor was a member of and maintained a share account with the Credit Union. On July 19, 1983, he signed and returned to the Credit Union a form accepting $1,000 "free" accidental death insurance and ordering $150,000 in additional insurance offered by INA through its agent Freimark

& Thurston. The form also designated Garland as his beneficiary.

By returning the signed form, Taylor authorized the Credit Union "to make the necessary periodic share account deductions" for the additional insurance. The premiums to be deducted automatically from Taylor's share account were to be deposited in a Credit Union account along with the premiums deducted from the share accounts of other members. From this account, the Credit Union was to draw a single check that it would send to Freimark & Thurston on behalf of those members participating in the insurance program for the payment of premiums.

Taylor's coverage was to become effective on September 1, 1983. The quarterly premium required for the amount of insurance ordered by Taylor came to $65.25.

Taylor had sufficient funds in his credit union account with which to pay the premium on July 19, 1983, the date he enrolled in the insurance program, through September 1, 1983, the date the first quarterly premium became due; however, the Credit Union made no attempt during this period to deduct the premium from Taylor's share account.

On September 1, 1983, Taylor made a $15 withdrawal from his share account. The withdrawal reduced his balance to $91.85. Taylor withdrew an additional $30 the following day, thereby dropping his balance to $61.85. As a consequence of these withdrawals, Taylor did not have sufficient funds in his share account to cover the $65.25 premium deduction when the Credit Union attempted to deduct the premium on September 8, 1983.

Because Taylor did not have sufficient funds with which to pay the premium, the Credit Union notified Freimark & Thurston that it had been unable to deduct the premium from Taylor's share account.

The Credit Union made no other attempt to deduct the premium from Taylor's share account, even though on September 15, 1983, Taylor deposited funds therein that raised his balance to an amount sufficient to pay it. His share account balance remained sufficient to pay the premium through the remainder of September and up through October 3, 1983.

On October 4, 1983, Freimark & Thurston send Taylor an

"Insufficient Share Notice." The notice informed Taylor that the Credit Union had been unable to send it the premium for the insurance Taylor had ordered because his share account lacked sufficient funds from which the Credit Union could make a deduction to pay the premium.

The notice advised Taylor that he could avoid "a suspension of coverage" by sending the "[p]remium [d]ue, along with th[e] notice in [the] return envelope provided." The notice further advised Taylor that his "premium remittance" had to be "postmarked within ten (10) days or [his] insurance [would] be suspended for non-payment of premium as of 30 days after the quarterly due date." The notice listed the quarterly due date to be September 1, 1983, and specified the premium due to be $65.25. Across the bottom of the notice appeared the following written in capital letters, "PLEASE INCREASE YOUR SHARE ACCOUNT DEPOSITS SO THAT A SHORTAGE WILL NOT RE-OCCUR."

On November 12, 1983, Taylor was killed in a hunting accident without ever having paid Freimark & Thurston $65.25 to cover the premium.

This action followed.

The trial court found for the defendants and denied coverage on the ground of non-payment of premium.

## ISSUES

1. Whether the Credit Union's failure to deduct from Taylor's share account funds with which to pay the first quarterly premium for group accidental death insurance coverage either between the enrollment date, July 19, 1983, and the policy's premium due date, September 1, 1983, inclusive, or between September 15 and October 3, 1983, inclusive, enables Taylor's beneficiary to claim coverage?

2. Whether INA waived its policy terms regarding forfeiture of coverage and is estopped from declaring a breach of a policy term that required payment of the first quarterly premium because of Freimark & Thurston's mailing of the "Insufficient Share Notice" to Taylor on October 4, 1983?

3. Whether the Electronic Fund Transfer Act governed the Credit Union's duty to make periodic deductions of funds from Taylor's share account with which to pay his insurance premiums?

## DISCUSSION

As we begin our discussion of the issues involved, we agree and the defendants concede, the Credit Union was INA's agent for the purpose of collecting all premiums due INA for the accidental death insurance policy in question.

### I.

Garland bases her claim of coverage on the Credit Union's failure, after it agreed to make "necessary periodic ... deductions" from Taylor's share account of funds with which to pay the premiums for the additional insurance ordered by Taylor, to make a deduction either between July 19, 1983, and September 1, 1983, inclusive, or between September 15, 1983, and October 3, 1983, inclusive, when Taylor had sufficient funds in his account with which to pay the first quarterly premium.

Garland's argument, however, rests on the assertion that the Credit Union was required either to deduct the first quarterly premium on or before September 1, 1983, or to monitor Taylor's share account, if it contained insufficient funds with which to pay the premium when the Credit Union made its first attempt to deduct it, and to make a repeated effort to deduct the premium from Taylor's share account when the share account again contained sufficient funds with which to pay it. We see no merit to Garland's argument.

Nothing on the enrollment form places on the Credit Union, either expressly or impliedly, the responsibility to deduct the first quarterly premium on or before September 1, 1983, or to monitor Taylor's share account and make a second attempt to deduct it should the Credit Union's first attempt at collecting the premium be unsuccessful and Taylor, as he did between September 15, 1983 and October 3, 1983, later have sufficient funds in his share account to pay the premium.

Indeed, the materials used to advise Taylor concerning the insurance and his responsibilities, expressly counselled him "[to make] sure to increase your payroll deduction so that you have adequate shares to cover the premium."

Since no provision in the insurance contract either directed the Credit Union to deduct the first quarterly pre-

mium on or before a specific date, more particularly, on or before September 1, 1983, or required the Credit Union to monitor his account in the event it was not sufficient to pay the premium whenever the Credit Union went to deduct it, Taylor was required, until the deduction was made, to maintain at all times in his account sufficient funds from which the Credit Union could deduct the sum of $65.25 for transmittal to INA in payment of his insurance coverage.

In holding that the policy did not require the Credit Union to deduct the first quarterly premium on or before September 1, 1983, or to monitor Taylor's account if it lacked insufficient funds with which to pay it, we have not overlooked Garland's contention that the 31-day grace period prescribed by the policy did not apply to the first quarterly premium. The trial court deemed this contention irrelevant. So do we.

Garland does not seek coverage for a death occurring within 31 days of September 1, 1983, the date the first quarterly premium was due; rather she seeks coverage for a death occurring on November 12, 1983, which was after the insurer had notified Taylor on October 4, 1983, that he had not paid the premium and had given him a 10-day opportunity "[t]o avoid a suspension of coverage" by paying it. The question of whether Taylor had coverage during the 31-day period following September 1, 1983, does not concern us.[1]

The trial court, therefore, properly found in favor of the insurance company and its agents. *Cf. Weeks v. Pilot Life Insurance Co.*, 256 S. C. 81, 180 S. E. (2d) 875 (1971) (an insurer could not deny coverage to an employee under a group policy because it had not received a payment of premium where the employer had deducted the premium from the employee's wages but had failed to remit the premium to the insurer prior to the employee's death); *Clark v. Home*

---

[1] We note that Freimark & Thurston mailed Taylor a certificate of insurance in September, 1983, even though Taylor paid no premium for the insurance.

We note also that the master policy, held only by the Credit Union, contains conflicting provisions regarding whether the 31-day grace period followed each premium due date, including the first one. The certificate of insurance given Taylor, however, contains no such conflicting provisions and clearly extends a 31-day grace period after all premium due dates.

*Fund Life Insurance Co.*, 79 S. C. 494, 61 S. E. 80 (1908) (an insurer could not deny coverage where its agent agreed to be responsible for the insured's premiums); *Equitable Life Assurance Society of the United States v. Mittelhauser*, 130 Fla. 794, 178 So. 559 (1938) (an insurer could not deny coverage for nonpayment of premium where the insurer's agent, who had the authority to collect premiums from the insured's bank account, promised the insured he would pay the premium and charge the insured's checking account therewith in the event the insured's checking account was insufficient to pay any premium on its due date); *National Foundation Life Insurance Co. v. Wellington*, 526 So. (2d) 766 (Fla. Dist. Ct. App. 1988) (an insurer could not deny coverage on the ground of nonpayment of premium where the insurer breached its contract with the insured by failing to withdraw funds from the insured's bank account to pay the premiums on the policy sold the insured by the insurer).

## II.

We likewise find no merit in Garland's contentions that the mailing of the "Insufficient Share Notice" by Freimark & Thurston to Taylor on October 4, 1983, "manifested a waiver by [INA] of the policy terms with respect to forfeiture" and operated to estop INA from declaring "a breach of policy terms for want of [a] premium payment."

At most, the notice sent by Freimark & Thurston constituted an offer, which Taylor did not accept or otherwise act upon, to continue Taylor's group accident death insurance coverage if he mailed the past due first quarterly premium within a prescribed time. *Cf. Hodge v. National Fidelity Insurance Co.*, 221 S. C. 33, 68 S. E. (2d) 636 (1952) (a letter erroneously advising an insured after his policy had lapsed that the grace period had almost expired held to constitute an offer that was never accepted by the insured).

## III.

Also lacking merit is Garland's contention that the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* (1982 & Supp. V 1987), governed the Credit Union's duty to make periodic deductions of funds from Taylor's

share account with which to pay his insurance premiums. Because the transaction at issue, had it been completed, would have concerned an automatic transfer of funds from a consumer's account to an account of the Credit Union, the transaction is exempt from the Act. 12 C.F.R. § 205.3 at 105 (1988). This is so, even though the Credit Union would have ultimately transferred any funds collected by it from Taylor's account to Freimark & Thurston, a third party. 12 C.F.R. No. 3-10 at 128 (1988).

For the foregoing reasons, the judgment is

Affirmed.

GARDNER and CURETON, JJ., concur.